Filed 7/13/16  In re K.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.H., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065550 |
| Plaintiff and Respondent, | (Super.Ct.No. J251265) |
| v. | OPINION |
| H.H. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant H.H.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.H.

1

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court terminated the parental rights of H.H. (Mother) and J.H. (Father) to their daughter, K.H. (Welf. & Inst. Code, § 366.26.)[1] Father contends the juvenile court erred by terminating his parental rights because the court should have applied the parent-child bond exception (§ 366.26, subd. (c)(1)(B)(i)) or the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)). Mother joins in Father's contentions and asserts that if the order terminating Father's parental rights is reversed, then the termination of her parental rights should also be reversed. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.    BACKGROUND

K.H. is female and was born in September 2013. Mother and Father were never married, and their relationship ended several months prior to K.H.'s birth. Father resided with friends in Trona. K.H. resided in Trona with (1) Mother; (2) Mother's son, W.H.; (3) Mother's boyfriend, W.Z.; and (4) W.Z.'s two sons, H.Z. and B.Z. W.H. was born in March 2011; his father is L.L. As of September 2013 L.L. had never parented W.H.; L.L. was in the military, stationed in Hawaii. In September 2013, H.Z. was six years old, and B.Z. was four years old.

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

B. FIRST DETENTION

In September 2013, approximately 12 days after K.H.'s birth, a person at H.Z.'s school contacted San Bernardino Children and Family Services (the Department) to report that, during a classroom discussion about feelings, H.Z. said his father, W.Z., had hurt him. H.Z. lifted his shirt and revealed three red marks that appeared to be abrasions or scratches.

H.Z. told the Department social worker that Mother and W.Z. struck him. H.Z. showed the social worker "deep purple bruises on his buttocks and red marks on his legs and chest." H.Z. also had a cut under his left eye, and said W.Z. cut him with scissors. H.Z. said Mother put duct tape on him and placed him in a bathtub "for a long time."

B.Z. said W.Z. struck B.Z., but B.Z. did not have any marks on his body. B.Z. and H.Z. were unkempt and smelled "foul." W.H. and K.H. were too young to be interviewed, but they were also unkempt and smelled "foul."

Mother told the social worker that H.Z. is sometimes restrained by binding his hands and feet with duct tape. Mother said she bound H.Z.'s hands and feet with duct tape, covered his mouth with duct tape, and placed him in a bathtub for two to two and one-half hours. H.Z. said there was water in the bathtub. The bathtub incident occurred in September. Mother said she was acting at W.Z.'s direction, after H.Z. was sent home from school for behavioral issues.

Mother was arrested due to allegations of child abuse. W.H. and K.H. were removed and placed together in a foster home.

3

C.     FIRST JURISDICTION AND DISPOSITION

Mother, Father, and the Department attended mediation.  Mother submitted on the allegation that she inflicted physical abuse on a non-related child in her care, which placed W.H. and K.H. at risk of being abused.  (§ 300, subd. (a).)  Father submitted on the allegation that his ability to care for K.H. "is in question at this time."  (§ 300, subd. (g).)

Mother and Father were present at the contested jurisdiction and disposition hearing.  The court found the foregoing two allegations to be true.  The court ordered K.H. removed from Mother's and Father's custody, and declared K.H. a dependent of the court.  The court authorized visitation between K.H., Mother, and Father, once per week for two hours.  In December 2013, K.H. and W.H. were placed in the home of their maternal grandmother (Grandmother) and step-grandfather (collectively, Grandparents), in Trona.

D.     SIX-MONTH REVIEW

Mother completed her parenting classes and was participating in individual counseling.  Mother intended to plead guilty in her criminal case, which would result in 30 days of community service and five years of probation.  Mother was residing with her aunt and studying for a nursing degree.

Father completed his parenting classes.  Father tested negative in random drug tests from December 2013 through April 2014.  Father moved into a duplex owned by relatives, so he did not have to pay rent.  Father's home had a room for K.H., and he had supplies for her.  Father was temporarily employed at a mineral plant in Trona.

4

Mother and Father consistently visited K.H. and no problems were reported regarding the visits. K.H. and W.H. continued residing together with Grandparents.

The juvenile court ordered that K.H. and W.H. continue to be removed from Mother's and Father's custody. The court authorized unsupervised visitation between K.H., Mother, and Father once per week for eight hours or twice per week for four hours, with the option for the Department to liberalize visitation.

E.      12-MONTH REVIEW

Father completed his individual counseling. Father continued testing negative for drugs in May and June 2014, but was a no-show for one test at the end of June. Mother moved into a home owned by a relative, so she did not have to pay rent. K.H. and W.H. spent three days per week with Mother. K.H. spent three days per week with Father.

On October 21, 2014, the juvenile court ordered K.H. be placed in Mother's custody on a plan of family maintenance. The court authorized Father to have unsupervised visits with K.H. once per week for eight hours or twice per week for four hours, with the option for the Department to liberalize visitation.

F.      SECOND DETENTION

On March 17, 2015, Father had K.H. in his arms while speaking to a Department social worker. Father had just picked up K.H. from Mother. K.H. had a "significant bruise" on her outer thigh, which "appeared looped and was not consistent with an accidental injury." Father explained that he dropped off K.H. with Mother on March 13. On March 14, Mother sent an e-mail to Father reflecting K.H. was developing a

5

bruise on her thigh. Mother accused Father of causing the bruise. Father said he did not cause the bruise. Father told the social worker Mother had previously written in an e-mail that she could only get K.H.'s attention by striking the child. Father asked Mother not to hit K.H. Mother said she was joking. Father said Mother accessed his e-mail account and deleted the e-mail.

K.B., the mother of two of Father's other children, said Father was never violent with her or their two children. Mother also said Father was not violent and does not physically punish his children, including K.H. Father denied harming K.H.

The social worker visited Mother's home. W.H. had "three round bruises on his forearm, the remnants of a black right eye and a scrape on his lower vertebrae." The small round bruises appeared to be a grab mark. W.H. could not explain the injuries. Mother said W.H. falls and the black eye was caused by a doorknob. W.H. did not visit Father because they are not related. Mother said she had been experiencing stress due to school finals, which caused her to suffer canker sores. The middle of Mother's lower lip was raw and bordered by vertical lines; the injury was similar to that caused by a hot glass pipe used to smoke illegal drugs.

The juvenile court ordered K.H. and W.H. removed from Mother's custody. The court granted supervised visitation for K.H., Mother, and Father once per week for two hours. The court ordered Mother to take a drug test. Mother took the drug test, and the results were negative.

## G. SECOND JURISDICTION

W.H. said he received the black eye when he ran into a door at his aunt's house; he did not know how his arms were bruised, but that he had probably fallen down. W.H. explained that Mother takes his toys away when he acts badly. The Department social worker asked W.H. if Mother struck him. W.H. responded, "No, her don't. Her be good." The social worker asked how K.H. was bruised. W.H. said she fell down at Father's house. The social worker asked what Mother does when K.H. acts badly. W.H. responded, "Her smack her butt, her smack her in the head, her smack her on the leg and get a bruise."

On March 19, 2015, a medical exam was conducted on K.H. at the California Assessment Center. The results were "suspicious of physical abuse and that further information was needed." The exam found an excessive number of bruises and scrapes on K.H., and that the bruise on K.H.'s right thigh could be from a bite. Father thought the bruise on K.H.'s thigh looked like a belt mark. Father thought Mother was capable of striking K.H. with a belt, but had not seen her use an instrument to strike the child— he had seen her strike the child with her hand. On April 2, K.H. had a bruise on her arm, which Father said was bite mark from K.H.'s one-year old half-sister. Father had previously told Mother that his ex-girlfriend's children "have been hurting [K.H.]"

On April 8 the Department social worker spoke to K.B., Father's ex-girlfriend, who lived next to door to Father, and who was the mother of K.H.'s half-sister, M.B. K.B. said K.H. and M.B. were five months apart in age and "close to each other." K.B. explained the half-sisters "play together [and] sometimes hit each other." K.B. was

7

aware of M.B. pinching K.H., but did not think the bruise/bite mark was from M.B. because the mark was too large. Father's other children were removed on April 29.

On May 21, a doctor from the California Assessment Center concluded K.H. appeared neglected due to being underweight. The doctor also found K.H. suffered "probable physical abuse." The doctor did not know if the bruise on K.H.'s thigh was a bite mark, but opined that if it were, then it was from an adult. On June 17, the doctor found K.H. was "physically doing very well." K.H. continued residing with her Grandmother.

The court found true the following allegations: (1) while in the care of Father and Mother, K.H. suffered a significant bruise to her outer thigh (§§ 300, subd. (a), 387); and (2) Mother exhibited signs of illegal drug use by the injury to her lower lip, which impaired her ability to parent (§ 300, subd. (b)). The court ordered K.H. remain removed from Mother's and Father's custody. The court terminated reunification services. The court authorized K.H., Mother, and Father to have supervised visits once per week for two hours.

H.    TERMINATION

On November 30, 2015, Father's other children were returned to his custody. W.H. was to be sent to Hawaii for an extended visit with his father, L.L., for the purpose of determining "what kind of bond the child and the father have." K.H. continued residing with Grandparents. Grandparents were in their mid-forties, and were willing to adopt K.H. K.H. was bonded to Grandparents and viewed them as her parents.

8

Father testified at the termination hearing. K.H. lived with Father for approximately five months, when she was spending three days per week with Father and three days per week with Mother. Father had three daughters, K.B., M.B., and H.B., who lived next door to him. When K.H. was at Father's house the three other daughters spent half their time at Father's house.

Father attended all but one-half of one of his visits with K.H. In the six months prior to the hearing, Father visited with K.H. once per week for two hours. The supervised visits took place at Grandparents' house and were supervised by Grandparents. During the visits, K.H. and Father ate snacks together, played in her room or outside, watched videos online, and colored. At the beginning of each visit, K.H. ran toward Father, yelled, "Daddy," tried to open the gate, and wanted Father to hold her. At the end of each visit, K.H. got quiet, said "bye," and tried to avoid being hugged or kissed by Father. Father loved K.H. and thought she loved him too. Father believed the two shared a bond.

The Department social worker, who had worked on the case since December 2014, also testified at the hearing. The social worker had not supervised Mother's or Father's visits, but had spoken to the Grandmother about the visits. Grandmother told the social worker K.H. was comfortable with Mother and Father. The social worker recommended parental rights be terminated because K.H. is bonded to Grandparents. K.H. was removed from Mother's care when K.H. was approximately two weeks old. For approximately five months, K.H. spent half the week with Mother, but the remainder of her life (approximately one year seven months) had been spent with

9

Grandparents. K.H. called Grandmother "Mom." Additionally, Grandparents had four children living at home. The four children treated K.H. as a sibling; K.H. was bonded to the four children. Grandparents had six children total, ranging in age from five to 24 years old. The four children at home were ages 17, 14, nine, and five. The social worker believed K.H. would receive the greater benefit from being adopted.

The Department argued that parental rights should be terminated because K.H. had lived with Grandparents for most of her life and was bonded to them. K.H.'s attorney also argued in favor of terminating parental rights. K.H.'s attorney spoke with Father's other children and found preserving the relationship with those children would not outweigh the benefit of stability that K.H. would receive from adoption. K.H's attorney asserted having K.H. removed twice showed a lack of stability on the part of Mother and Father. K.H.'s attorney argued K.H. was bonded to Grandparents, with whom she had lived most of her life. Father's attorney argued for a lesser plan of legal guardianship but did not state reasons in support of that position. Mother's attorney also argued for a lesser plan of legal guardianship. Mother's attorney asserted five months was roughly 20 percent of K.H.'s life, and that Mother had been visiting K.H. on a weekly basis for all of K.H.'s life, so Mother and K.H. were bonded.

In regard to the parent-child bond exception, the juvenile court said, "[P]arents really haven't occupied a parental role for most of [K.H.]'s life. She was removed in September of 2013, which is the same month that she was born, and was taken from their care for more than a year. [¶] She was then removed again in June of 201[4] and

has been with the same grandparents during this last removal. She was with them in the previous removal and it's clear that that is who her bond is with.

"In order to find a lesser permanent plan I'd have to find that severing the parental relationship will greatly harm the child and this isn't even close. The Court, in fact, believes it would be severely detrimental to [K.H.] to sever the relationship with the grandparents. Not that that's what's being asked, but the permanency is clearly in her best interest as reflected by counsel. These are the People who have taken care of her and taken care of her in a parental role for most of her life. She's just about two and a half years old or just over two and a half years old." The court found it was likely K.H. would be adopted. The court terminated Mother's and Father's parental rights.

## DISCUSSION

### A. FATHER'S APPEAL

#### 1. *BIOLOGICAL FATHER*

##### a) Facts

Mother and Father were never married and Father is not named on K.H.'s birth certificate. Mother and Father ended their relationship several months prior to K.H.'s birth. Father had not provided support for K.H. prior to her removal by the Department.

At a hearing in which the first jurisdiction hearing was set as contested, the juvenile court ordered Father to undergo paternity testing at the Department's expense. At the first contested jurisdiction hearing, on November 4, 2013, the court found Father to be K.H.'s biological father. At the second jurisdiction hearing, the court found Father to be K.H.'s biological father. In the minute order reflecting the termination of parental

11

rights, Father is described as being K.H.'s biological father. In the juvenile court's order terminating parental rights Father is described as being K.H.'s biological father.

Father received services while this case proceeded in the juvenile court—parenting classes, individual therapy, and drug testing. Father participated in mediation related to the first contested jurisdiction and disposition hearing. Father was present at the first contested jurisdiction and disposition hearing. Father joined in Mother's request for a contested hearing for the second jurisdiction and disposition. Father was present at the second contested jurisdiction and disposition hearing. Father's attorney cross-examined witnesses at the hearing. Father testified at the hearing as a witness on his own behalf. Father also provided the testimony of K.B., the mother of his other children. Father was present at the termination hearing and testified as a witness on his own behalf. Also at the termination hearing, Father called the Department social worker as a witness.

b)      Analysis

The Department contends Father lacks standing to raise issues on appeal because he is a biological father, rather than a presumed father.

"The dependency system recognizes four classes of fathers: alleged, natural, presumed, and de facto." (*In re E.O.* (2010) 182 Cal.App.4th 772, 726.) "A natural father is one who has been established as a child's biological father. The term 'natural father' means that while the man's biological paternity has been established, he has not yet achieved presumed father status. [Citation.] A presumed father is 'one who "promptly comes forward and demonstrates a full commitment to his paternal

12

responsibilities—emotional, financial, and otherwise . . . .""" (*Ibid.*) A biological father bears the burden of establishing he is a presumed father, by showing he promptly came forward and fully committed to his parental responsibilities. (*In re E.T.* (2013) 217 Cal.App.4th 426, 437.)

"Only presumed fathers are entitled to reunification services and to possible custody of the child." (*In re E.O.*, *supra*, 182 Cal.App.4th at p. 726.) A juvenile court may order reunification services for a natural father, if the court determines the services will benefit the child. (§ 361.5, subd. (a).) A natural father is not entitled to custody of his child. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454; *In re E.T.*, *supra*, 217 Cal.App.4th at p. 437.)

"Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid. Code, § 623.)

The record reflects Father fully participated in the court process. Father provided evidence at hearings, participated in mediation, participated in reunification services, and had three-day visits with K.H. during a five-month period. The Department raised no objection to Father being treated as a presumed father in the juvenile court, i.e., with full entitlements, despite Father allegedly lacking standing to do so. On the other hand, Father was represented by counsel and should have been well aware of the need to obtain presumed father status to ensure his ability to contest termination of his parental rights.

It is a close call as to whether the Department should be estopped from arguing a lack of standing on appeal. (Evid. Code, § 623.) Father should have sought presumed father status, but he had no reason to do so because the juvenile court and Department treated him as a presumed father. We conclude, *post*, that the juvenile court's judgment must be affirmed and therefore, for the sake of addressing the issues, will assume, without deciding, that the Department is estopped from arguing Father lacks standing because the juvenile court the Department treated Father as though he were a presumed father.

### 2. *PARENT-CHILD BOND*

Father contends the juvenile court erred by not applying the parent-child bond exception to terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).)

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable. (§ 366.26, subd. (c)(1).) One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

There is a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception: (1) substantial evidence; (2) abuse of discretion; or (3) a hybrid of substantial evidence and abuse of discretion. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576

14

[Fourth Dist., Div. One applied the substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [First Dist., Div. Three applying the abuse of discretion standard]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [Second Dist., Div. Eight applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [Second Dist., Div. Seven applying the hybrid standard]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [Sixth Dist. applying the hybrid standard in a sibling relationship exception case].)

Father contends we should apply the abuse of discretion standard of review by reviewing the juvenile court's findings of fact for substantial evidence, reviewing its conclusions of law de novo, and reviewing its application of the law to the facts under the abuse of discretion standard. Because Father refers to three standards of review, it is unclear exactly which standard he would like applied in this case. We infer, due to the combination of standards mentioned, that Father would prefer the hybrid standard of review, and therefore we will apply the hybrid standard.

The record reflects Father consistently visited K.H. and maintained contact with her. Thus, we will focus on the beneficial relationship prong of the analysis. Under the hybrid standard, the issue of whether a beneficial relationship exists is reviewed for substantial evidence. The decision of whether that relationship constitutes a compelling reason for termination being detrimental to the child is reviewed for an abuse of discretion. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622.)

"The benefit to the child from continuing such a relationship must . . . be such that the relationship '"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."'" (*In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 449.) "'The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' [Citation] '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937-938.)

At the time of the initial detention, K.H. was less than two weeks old. At the time of the second detention, K.H. was approximately one and a half years old. At the time of the termination of parental rights, K.H. was approximately two and a half years old. This evidence supports the finding that K.H.'s emotional attachment to Father was weak, because she was extremely young when she was removed, and was still quite young at the time of termination. K.H.'s youth indicates she would have been bonded to her caretakers, i.e., Grandparents because they filled a parental role for most of her young life.

K.H. spent three days per week with Father for approximately a five-month period beginning when she was approximately one year old. This evidence supports the conclusion that K.H.'s emotional attachment to Father was weak because she did not

16

spend a significant amount of time in Father's care. Again, K.H. viewed Grandparents as her parents because they served as her parents for most of her life. For example, K.H. called Grandmother "Mom."

It appears from the evidence that Father and K.H. had positive interactions. During the visits, K.H. and Father ate snacks together, played in her room or outside, watched videos online, and colored. At the beginning of each visit, K.H. ran toward Father, yelled, "Daddy," tried to open the gate, and wanted Father to hold her. While the interactions were mostly positive, there is nothing indicating Father filled a parental role in K.H.'s life, as opposed to that of a friendly visitor.

The final consideration is the child's needs. K.H. was detained twice within approximately 18 months. The second detention was due to an unexplained bruise on K.H.'s thigh. Father's other children bit and hit K.H. The evidence supports the conclusion that K.H. needed a parental relationship that was more stable and nurturing than Father was able to provide. The dual removals within 18 months indicate a lack of stability. The hitting and biting that K.H. suffered indicate a lack of oversight by Father. Thus, K.H.'s needs for stability and nurturing would be better served by a different parental relationship.

In sum, K.H. was extremely young at the time of the initial removal, so she spent little time bonding with Father prior to removal; K.H. spent little time in Father's custody, so he did not occupy a parental role for a significant period of K.H.'s life; Father had positive interactions with K.H., but they were more in the nature of a friendly visitor than a parent; and the evidence reflects K.H.'s needs would be better

served by a different parental relationship. Accordingly, because the factors weigh against application of the parent-child bond, we conclude the juvenile court did not err.

Father contends the juvenile court erred because he occupied a parental role in K.H.'s life. Whether there is a beneficial parent-child relationship is reviewed under the substantial evidence standard of review. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622.) The substantial evidence standard requires that we look at the evidence in the light most favorable to the judgment. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Father highlights the evidence that he completed his case plan, had a room in his home for K.H., regularly visited K.H., and that K.H. yelled "Daddy" when Father visited K.H. Father is focusing on the evidence in a light most favorable to reversing the judgment. As we have explained *ante*, there is substantial evidence supporting the juvenile court's findings. Accordingly, we find Father's argument to be unpersuasive.

3. *SIBLING EXCEPTION*

Father contends the juvenile court erred by (1) not considering the sibling relationship exception in regard to the relationship K.H. shares with Father's other children; and (2) not applying the sibling relationship exception in regard to W.H. and K.H., based upon the hope that Grandparents would maintain the half-siblings' relationship.

In regard to the exception being applied due to K.H.'s relationship with Father's other children, Father has forfeited the issue by failing to raise it below. The burden was on Father to raise the exception in the juvenile court. (*In re Bailey J.*, *supra*, 189

18

Cal.App.4th at p. 1314.) Father's failure to raise the issue below forfeits it for appellate review. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292.)

Nevertheless, if Father had raised the issue below and if the juvenile court found the exception did not apply, the evidence would support that conclusion. The sibling relationship exception requires the juvenile court to take into consideration "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The substantial evidence standard of review applies to the question of whether a beneficial relationship exists. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Father had K.H. for three days a week during a five-month period, and his other children were present "half the time [father] had her." Thus, for a five-month period, K.H. spent approximately one and a half days per week with Father's other children. Father's other visits took place at Grandparents' house, and it does not appear that he brought his other children to those visits. Given the brief period of time K.H. spent with Father's other children, it would be reasonable for the juvenile court to have found K.H. was not raised in the same home as Father's other children, K.H. did not have significant shared experiences with Father's other children, and that K.H. did not have

strong bonds with Father's other children. As a result, the sibling relationship exception would not be applicable.

In regard to W.H., the juvenile court awarded custody of W.H. to L.L. (§ 361.2.) The law provides that if a non-custodial parent wants to assume custody of a child following removal, and that placement would not create a risk of detriment to the child, then the court "shall place the child with the parent." (§ 361.2, subd. (a).) The court can order that the nonoffending parent become the legal and physical custodian of the child, and then terminate its jurisdiction over the child. (§ 361.2, subd. (b)(1).)

At the time of the termination hearing in K.H.'s case, L.L. had already been awarded custody of W.H. We infer from the juvenile court's comments in the record that jurisdiction in W.H.'s case had been terminated. Thus, if the juvenile court had found the sibling bond presented a compelling reason not to terminate parental rights, there would have been no means of bringing the children back together for visits due to the court having jurisdiction over K.H., but not W.H. (See § 366.26, subd. (c)(1)(B)(v) [the point of the sibling bond exception is for the children to have ongoing contact].)

However, to the extent it could be argued that Mother's parental rights should not have been terminated because someday she may regain custody of W.H., and thus she should continue to have parental rights over K.H. for the sake of K.H. and W.H. someday being reunited, then that possibility of a future reunion would not prevail over the benefit of legal permanence that K.H. would obtain through adoption. (See § 366.26, subd. (c)(1)(B)(v) ["as compared to the benefit of legal permanence through

20

adoption"].) We will assume for the sake of judicial efficiency that K.H. and W.H. shared a bond, as testified to by the Department's social worker.

The abuse of discretion standard of review applies when determining whether the existence of a beneficial sibling relationship "constitutes a 'compelling reason for determining that termination would be detrimental.'" (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.) The evidence reflects K.H. was bonded with Grandparents and viewed them as her parents, calling Grandmother "Mom." The juvenile court could reasonably conclude that the stability K.H. would gain from being legally placed with Grandparents, who she viewed as her parents, would outweigh a speculative future reunion with a sibling because the stability was a real prospect, while the sibling reunion is speculation based upon Mother one day possibly regaining custody of W.H. Accordingly, we conclude the juvenile court did not err.

Father contends the juvenile court erred by considering the possibility of Grandparents maintaining a relationship between K.H. and W.H. when deciding not to apply the sibling bond exception. The juvenile court said, "[W]ith respect to the sibling bond, I just placed [W.H.] with his father out of state in Hawaii. So, I don't even know that a sibling bond exception in this case is even close to being met. [¶] Clearly they were raised together, but now that he's with his non-offending father in another state, I just cannot find that that would undo any benefit to [K.H.] to have her be adopted by her grandparents. And as [K.H.'s attorney] indicated, they are also the grandparents of [W.H.] So, that relationship will hopefully continue. But I can't find that any sibling

21

bond outweighs the need for permanency by [K.H.]; particularly based on these facts and the fact that [W.H.] is with his father in Hawaii now."

Based upon our reading of the record, the possibility of Grandparents maintaining a relationship between K.H. and W.H. was not a reason for the juvenile court's decision to not apply the sibling exception. Rather, it appears the juvenile court found the sibling relationship between K.H. and W.H. was not compelling when weighed against the benefit K.H. would gain from adoption. It appears the juvenile court considered the option of K.H. possibly maintaining a telephone or online relationship with W.H. against the option of K.H. having an in-person, parent-child legal relationship with the Grandparents she viewed as parents, and found K.H. would gain the greater benefit from the adoption. The juvenile court's decision was within the bounds of reason. (See *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642 [an abuse of discretion occurs when the juvenile court exceeds the bounds of reason].) Accordingly, we conclude the juvenile court did not err.

B.      MOTHER'S APPEAL

Mother joins in Father's arguments on appeal. Mother asserts that if the termination of Father's parental rights is reversed, then the termination of her parental rights should also be reversed. As explained *ante*, we have concluded the juvenile court did not err in regard to any issues raised in Father's appeal. Accordingly, there is no reason to reverse the judgment as it relates to Mother.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                    J.

We concur:

RAMIREZ _____
            P. J.

McKINSTER _____
            J.